IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Hagemeyer North America Inc., | ) | |
| | ) | |
| Plaintiff, | ) | C/A No. 2:05-3425 |
| | ) | |
| vs. | ) | |
| | ) | **ORDER and OPINION** |
| Ellis Thompson, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.     BACKGROUND**

This matter is before the court on plaintiff Hagemeyer North America, Inc.'s ("Hagemeyer") request for a preliminary injunction to enforce a noncompete agreement with former employee defendant Ellis Thompson ("Thompson"). Hagemeyer is a large distributor of products and services focusing on business-to-business markets in electrical, safety, and industrial products throughout North America. From 1977 to 2000 Thompson was a shareholder and employee with Cameron & Barkley Company ("CamBar"), a Georgia firm that merged with plaintiff in 2000. Hagemeyer sought to retain CamBar's key personnel to protect proprietary information, and extended employment to Thompson. Thompson received $1,600,000 for his equity interest in CamBar.

In conjunction with the merger, Thompson signed a August 29, 2000 Employment and Noncompetition Agreement ("Agreement"). As consideration for the Agreement, Thompson received continued employment and a stay-on bonus of $273,001. The Agreement includes both a noncompete provision and restrictions on Thompson's ability to solicit Hagemeyer's customers. The Agreement applies to CamBar's

successors. Specifically, it provides:

8. NON-DISCLOSURE OF TRADE SECRETS, NON-SOLICITATION AND COVENANT NOT TO COMPETE: In consideration of the substantial benefits conferred upon Employee as a direct consequence of CamBar's retention of Employee as an Employee of CamBar, Employee further covenants and agrees as follows:

a. <u>Non-Disclosure of Trade Secrets</u>: Employee agrees that, both during and following the Applicable Period[1], he will not directly or indirectly disclose to any person, firm, corporation, or other entity any of CamBar's Trade Secrets for any purpose whatsoever. Employee acknowledges that CamBar's Trade Secrets have been acquired and maintained by CamBar at great effort and expense, constitute valuable assets to CamBar, and are maintained in secrecy by CamBar.

. . . .

d. <u>Non-soliciation of Customers</u>: Employee agrees that he will not during the Applicable Period, directly or indirectly, assist, be associated with, consult with, or support, whether as an individual on his own account, or as a partner, owner, shareholder, joint venturer, employee, agent, salesman, or official, any Conflicting Organization[2] when that assistance, support or association involves Employee directly or indirectly calling upon, causing to be called upon, communicating with or assisting others in communicating with or otherwise attempting to bring about any transaction to the detriment of CamBar's business between a conflicting organization and a Customer[3]:

- who was served by Employee at any time during Employee's employment with CamBar, or

- whose names and/or addresses were furnished to Employee by CamBar in the furtherance of CamBar's Business, or

---

[1] The Applicable Period is one year from the date of his resignation, from November 15, 2005 until November 15, 2006. See Agreement §1(b).

[2] "Conflicting Organization means any person, organization or entity (other than CamBar) engaged, directly or indirectly, in CamBar's Business." Agreement § 1(i).

[3] "Customers means all accounts of CamBar and/or accounts solicited by CamBar and its employees, including Employee, during the twelve (12) month period immediately preceding Employee's Date of Termination." Agreement §1(j).

> - with whom Employee had any contact, written or verbal, in connection with the furtherance of CamBar's Business while in the employ of CamBar.
>
> e.   <u>Covenant Not to Compete:</u> Employee further covenants and agrees that during the Applicable Period, he will not directly or indirectly engage in or receive any business of a Conflicting Organization, either as an individual on his own account, or as a partner or as an employee, or in any capacity whatsoever, in the geographic area set forth in Attachment C [Georgia].  However, Employee may accept employment with a Conflicting Organization if CamBar receives, prior to Employee's accepting such employment, separate written assurance, satisfactory to CamBar, from such Conflicting Organization and from Employee that Employee will not render services, directly or indirectly, in competition with CamBar's business or in connection with any Customers and that CamBar's trade secrets will remain undisclosed.  Notwithstanding anything to the contrary set forth in this agreement, a minor ownership interest (less than 2% of the issued and outstanding shares) in a Conflicting Organization that is publically traded shall not be deemed a violation of this Agreement.

Agreement § 8.  Thompson acknowledged and agreed "that the restrictions contained in section 8 are reasonable and necessary for the protection of their [CamBar's] respective legitimate interests." Agreement § 8(f).  Thompson also agreed that the restrictions are necessary

> for the reasonable and proper protection of CamBar's business. Employee further admits and declares that he considers each and every restriction reasonable with respect to the subject matter, length of time and territory covered, and that this Agreement does not restrict his ability to earn a livelihood.

Agreement § 9.  The Agreement provides that South Carolina law governs its interpretation.  Thompson was a regional vice president for sales from 2000 until his voluntary resignation on November 15, 2005.  In this position, Thompson oversaw sales organizations within his region and supervised account representatives, district managers,

and others. Thompson was responsible for electrical product sales to electrical contractors ("contractor and installer" customers, "C & I") throughout Georgia, North and South Carolina, and was involved in the company's strategic planning.

In June 2003 Hagemeyer informed Thompson that as of December 31, 2003 he would become an at-will employee. Thompson resigned his position via email on November 15, 2005, and six days letter Hagemeyer sent Thompson a letter reminding him of the Agreement's restrictions. Thompson has accepted a position with DH Supply Company, Inc. ("DH"), an entity which he admits is in the business of electrical distribution, and thus a direct competitor of Hagemeyer. He is awaiting resolution of this action before actually starting work at DH, which is located in Georgia. According to Thompson,

> As a DH employee, [Thompson] would work in the same industry as in his previous position with Hagemeyer, though his duties would be materially different in that they would encompass a range of duties far wider than just sales. DH has informed Thompson that it wants him to help run all operational aspects of the business, while the senior management of DH concentrates on finances, growing the business on the data and utility side, and trying to expand into Florida and Texas.

(Def.'s mot. in opp. at 5.) On December 8, 2005, Hagemeyer filed a complaint alleging breach of contract, breach of the duty of loyalty, and trade secrets violations. On December 12, Hagemeyer filed this preliminary injunction request, asking the court to prevent Thompson from violating the Agreement. Thompson has agreed to stay an arbitration proceeding underway in Georgia to determine the Agreement's enforceability.

## II.     ANALYSIS

In determining the grant or denial of a preliminary injunction, four factors must

be considered:

> i.   the likelihood of irreparable harm to the plaintiff if the preliminary injunction is denied;
> ii.  the likelihood of harm to the defendant if the requested relief is granted;
> iii. the likelihood that the plaintiff will succeed on the merits; and
> iv.  the public interest.

Direx Israel, Ltd. v. Breakthrough Medical Corp., 952 F.2d 802, 812 (4th Cir. 1992).

### a. Irreparable Harm

Thompson objects to Hagemeyer's assertion that it has or will suffer irreparable harm. As noted, Thompson has accepted the job but not yet started. This fact effects the initial consideration for a preliminary injunction; i.e., the likelihood of irreparable harm to plaintiff if the preliminary injunction is denied. Id. Plaintiff must demonstrate it faces an immediate threat of irreparable harm without an injunction. Id. at 812, 816. The "required irreparable harm must be neither remote nor speculative, but actual and imminent." Id. at 812; see also ECRI v. McGraw-Hill, Inc., 809 F.2d 223, 226 (3rd Cir. 1987) ("Establishing a risk of irreparable harm is not enough. A plaintiff has the burden of proving a clear showing of immediate irreparable harm.").

Hagemeyer identifies the imminent injury as loss of customer goodwill and disclosure of trade secrets and confidential information. Thompson argues that he knows no trade secrets, and that his employment with DH would pose no threat to Hagemeyer. Thompson contends all customers are known, and the various prices and margins are published in trade journals. Hagemeyer notes that Thompson possesses information on Hagemeyer and CamBar's pricing strategies, discount programs, and personnel, as well as his long-standing personal relationships with customers in his service area. Thompson

admits that DH is a direct competitor of Hagemeyer. Given Thompson's length of service in this industry and knowledge of the relevant customer base in Georgia, it appears he is vastly understating his knowledge about CamBar's business practices. Moreover, in the Agreement Thompson acknowledged the importance of keeping the proprietary information confidential. It makes no sense that Hagemeyer would require such an extensive non-compete agreement if Thompson knew nothing. As such, Thompson's employment with DH poses a threat to plaintiff's business interests.

Thompson is delaying the start of his job with DH pending the resolution of this action. His possible employment presents a risk of irreparable harm, but not an imminent threat, since Thompson could decide not to pursue his DH position.[4] The injury is contingent on Thompson's future decisions, which the court presumes this Order will influence. As such, Hagemeyer does not face a threat of imminent, irreparable harm sufficient to warrant injunctive relief. Hagemeyer's motion for a preliminary injunction is thereby denied. Nonetheless, the court will address the Agreement's enforceability, since its validity is essential to any possible future injunctive relief.

### b.     Non-compete agreement

South Carolina law generally disfavors covenants not to compete and strictly construes them against the employer. Faces Boutique, Ltd. v. Gibbs, 318 S.C. 39, 42, 455 S.E.2d 707, 708 (Ct. App. 1995). As a general rule, such covenants are given greater

---

[4] The case cited by Hagemeyer involves a more imminent and immediate threat than the circumstance at bar. See Blum v. Yaretsky, 457 U.S. 991 (1982). Given the discretion accorded the court in such matters, Fourth Circuit case law on this aspect of injunctive relief, and the court's ultimate conclusion regarding the Agreement's enforceability, the threat posed is insufficient to warrant an injunction at this time.

deference in the context of a sale of business than in the employment context. 54A Am. Jur. Monopolies and Restraints of Trade § 247 (2005). "Any such restriction must be narrowly drawn to protect the legitmate interests of the employer." Faces Boutique, 318 S.C. at 42, 455 S.E.2d at 708. A covenant not to compete will be upheld if it is:

> (1) necessary for the protection of the legitimate interest of the employer; (2) reasonably limited in its operation with respect to time and place; (3) not unduly harsh and oppressive in curtailing the legitimate efforts of the employee to earn a livelihood; (4) reasonable from the standpoint of sound public policy; and (5) supported by a valuable consideration.

Stringer v. Herron, 309 S.C. 529, 532, 424 S.E.2d 547, 548 (Ct. App. 1992). Such cases are highly dependent on their own set of facts. Id.

Despite the general disposition against such agreements, South Carolina courts have upheld non-compete agreements if they comport with the above requirements. Thompson challenges the Agreement on elements 1, 2, 3 and 5.

### i.     Employer's Legitimate Interest

Thompson accurately notes that Hagemeyer has no legitimate interest in prohibiting competition. See Almers v. S.C. National Bank, 265 S.C. 48, 217 S.E.2d 135 (1975). Hagemeyer views the interests to be protected as its existing business contacts, customer goodwill, trade secrets, and proprietary information. These concerns are legitimate business interests that warrant protection. See Wolf v. Colonial and Acc. Life Ins. Co., 309 S.C. 100, 420 S.E.2d 217 (Ct. App. 1992) (recognizing legitimate business interests in existing business contacts and trade secrets).

### ii.     Unduly Harsh or Oppressive

Thompson contends the agreement unduly restricts his ability to earn a

livelihood.[5]  This element is closely related to the duration and geographic scope of the limitation.  Both the noncompete and nonsolicitation provisions expire on November 16, 2006.

The noncompete limitation forbids Thompson to "engage in or receive any business of a Conflicting Organization, either as an individual . . . or as a partner or as an employee, or in any capacity whatsoever." Conflicting Organization includes any person, organization or entity, engaged, directly or indirectly, in CamBar's business. Agreement § 1(j).  CamBar's business includes

> the business of (i) branch-based distribution to industrial, governmental and commercial customers of maintenance, repair and operation supplies, including industrial, electrical and electronic, safety supplies, automation & control equipment, material handling and power transmission equipment, coating products, cutting tools, lighting, distribution equipment, abrasives, data telecom equipment, hand & power tools, janitorial supplies, lubricants, shelving & storage products; (ii) storeroom management, outsource purchasing, and integrated supply services for industrial, governmental and commercial customers; and (iii) sales of supplies for electrical contractors.

Agreement §1(e).  The covenant not to compete precludes Thompson from participating in businesses engaged in the above-listed activities.  Hagemeyer's filings and court arguments suggest that the first and third subsections provide the salient restrictions on Thompson.

The separate nonsolicitation provision is limited to Hagemeyer customers from

---

[5] At the hearing on this motion, Thompson did not allege that he cannot earn a living if this court were to enjoin him; rather, he complains that he cannot earn at the same level he would have if he had not left Hagemeyer.  The court has heard estimates (from Thompson himself) that he could earn between $75,000 and $130,000 per year without violating his Agreement.  He also noted he could get these jobs.  For most folks, $75,000 - $130,000 is a pretty good living.

November 15, 2004 - November 15, 2005 who were served by Thompson, with whom Thompson had any contact, or whose names or addresses Hagemeyer provided to Thompson.

Contrary to Thompson's assertion, these restrictions do not shut him out of the industry. As noted, the Agreement is limited in scope and duration. The noncompete provision permits Thompson to work for a competitor as long as he does not render services in competition with Hagemeyer's business or customers, and does not disclose trade secrets. Thompson may also work for businesses not involved in the activities specified in section 1(e). Hagemeyer notes permissible employers include government entities, manufacturers, customers, suppliers, and agents, among others. Further, Thompson can work for any business outside of Georgia (including entities in states he previously oversaw). Nor would Thompson have trouble finding willing employers; as noted in court, Thompson is well known throughout the region as a top salesman. The customers subject to the nonsoliciation agreement are also appropriately limited. Moreover, the restrictive period for both covenants only extends for another eight and a half months.

Several other practical considerations weigh against Thompson. He signed the Agreement, which specifically states that "he considers each and every restriction reasonable with respect to the subject matter, length of time and territory covered, and that this Agreement does not restrict his ability to earn a livelihood." Agreement § 9. He now disagrees with that statement, although his initial decision must have been informed by his successful career in the industry. Plaintiff's attempt to portray himself as an

underdog battling Goliath is undermined by the fact that he received over $1.5 million in the buyout. At that price, one assumes he was either represented by counsel or is a sophisticated businessman who took a keen interest in the Agreement's provisions. It simply belies reason that someone in his position did not know or take seriously the Agreement's provisions.

The restriction's statewide geographic reach does not automatically render it void. South Carolina courts have struck down statewide restrictive covenants, but not for that reason alone; a particular geographic scope is "generally reasonable if the area covered by the restraint is limited to the territory in which the employee was able, during the term of his employment, to establish contact with his employer's customers." Rental Uniform Service of Florence, Inc. v. Dudley, 278 S.C. 674, 676, 301 S.E.2d 142, 144 (1983). The noncompete provision's scope is actually smaller than his territory for Hagemeyer. Thompson was responsible for sales throughout Georgia, North Carolina and South Carolina, but the noncompete provision is limited to Georgia. As such, the geographic reach is reasonable.

      iii.    **Consideration**

Thompson contends that the Agreement was not supported by valuable consideration because Hagemeyer did not renew his term of employment in 2003, but rather reclassified him as an at-will employee. The Agreement specifies the consideration as the "substantial benefits conferred upon Employee as a direct consequence of CamBar's retention of Employee as an employee of CamBar." The South Carolina Supreme Court has held that a covenant entered into at the inception of

employment "may be enforced where the consideration is based solely upon the at-will employment itself." Poole v. Incentives Unlimited, Inc., 345 S.C. 378, 382, 548 S.E.2d 207, 209 (2001). Defendant entered into the Agreement at the inception of his employment with plaintiff.

Even if defendant were deemed to have entered into the covenant after the inception of employment, the consideration is valid. "When a covenant is entered into after the inception of employment, separate consideration, in addition to continued at-will employment, is necessary in order for the covenant to be enforceable." Poole, 345 S.C. at 382, 548 S.E.2d at 209. In addition to employment, Thompson received a $273,001 bonus. Therefore, the court concludes that the Agreement would be enforceable.

## III.    CONCLUSION

For the reasons stated above, it is therefore **ORDERED** that plaintiff Hagemeyer's motion for a preliminary injunction is **DENIED**.[6] The parties are directed

---

[6] The court has several concerns regarding potential enforcement of the non-solicitation provision (section 8(d)) if Thompson were to violate it. Upon the court's request, Hagemeyer submitted a list of customers subject to the nonsolicitation provision. The nonsolicit provision applies to customers that Thomson "served," those whose names Hagemeyer provided to him, and those with whom he had "any contact." Hagemeyer's list includes all its C & I customers during the applicable period. Hagemeyer assumes that all of the C & I customers were either served or contacted by Thompson through his position as Regional Vice President overseeing C & I sales in Georgia, or were furnished by Hagemeyer to Thompson. However, Hagemeyer does not demonstrate that Thompson had a relationship with all of the companies on the list. It is entirely possible he never had any contact or relationship with some of these customers, never "served" them, or that Hagemeyer did not identify them to Thompson. It is also possible that some of the businesses never heard of him.

The list's accuracy is questionable for a second reason. Originally, the list included all customers solicited during calendar year 2005. Upon the court's request, Hagemeyer deleted customers solicited between November 16, 2005 and December 31, 2005. However, due to the database's limitations, this deletion is an estimation "based

to the court's conclusion that the Agreement is not void as a matter of law.

**AND IT IS SO ORDERED.**

_____
**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**March 1, 2006**
**Charleston, South Carolina**

---

upon historical sales experience." In order to issue a preliminary injunction the court would need something more concrete.